We'll proceed to the second case of the day, Glatfelter v. Windward. Mr. Satera. Mr. Satera, before you begin, of course the court was in receipt of your inquiry is that you're here today. I, for one, would like to know when you were aware of the negotiations on a consent decree? We first became aware of the negotiations when we received notice of the lodging of the consent decree. I'm sorry, when you received what? When we received notice of the lodging of the consent decree, we were unaware of the negotiations that had apparently resulted. Just recently then? Tuesday afternoon, Your Honor. Okay. All right. Thank you. Thank you. And we assume both of you agree we should go forward with the argument today? Yes, Your Honor. All right. Thank you. The district court erred when it held that personal jurisdiction over Windward was lacking. Windward's principal business, indeed its only real business, is managing Appheon's Fox River liabilities and directing Appheon's Fox River litigation in the United States. Windward has agreed to indemnify Appheon for liability it may occur in connection with the investigation and remediation of the Lower Fox River in Wisconsin. In return for this indemnity, Appheon granted to Windward all of Appheon's interest in insurance and other recoveries relating to the Lower Fox River. So, for example, if Appheon were to recover on its 107 claim, which is the claim that this court concluded was the section that Appheon should proceed under, those funds would flow through Windward. So Appheon is really a plaintiff in name only. And, in fact, Windward, as the record shows, and I don't believe there's any controversy, has pursued claims against Appheon's historic insurers. And the pursuit of those claims has taken place in the United States and, in fact, in Brown County, Wisconsin. In the words of Brian Tauscher, the company's general counsel and one of its directors, Windward has complete discretion to manage the defense of the Fox River claims. Now, that testimony by Mr. Tauscher took place in the Brown County courthouse, which is directly across the street from the district court sitting in Green Bay. Mr. Tauscher testified for several days in proceedings that are styled Continental Casualty versus Arjo Wiggins Appleton. And for the court's edification, Arjo Wiggins Appleton is the prior name of Windward. Similarly, Christopher Gower, one of three directors of Windward, testified in a deposition in the Brown County proceedings that Windward has the right to conduct the defense, to make insurance claims, to negotiate with the government. It has the right to manage the entire Fox River issue on behalf of Appheon. Indeed, the district court, in an earlier ruling, concluded that both Appheon and Windward may conceivably be regarded as real parties in interest. With those facts in mind, and without holding an evidentiary hearing, the district court erroneously concluded that personal jurisdiction over Windward was lacking. And in reaching that ruling, the court relied on essentially three things. First, the court concluded that simply employing a lawyer to represent its interests in the United States was insufficient. Second, that evidence about the ownership of Windward does not establish that Windward purposely availed itself of any forum. And third, that Windward's substantial stake in the outcome was not enough to establish minimum contacts. The court was wrong on all three counts. The concern expressed by the court with regard to employing a lawyer was phrased in terms of hiring a lawyer to defend an action. And of course, under those circumstances, if a foreign entity is sued and decides to retain a lawyer to defend that action, I think one could hardly argue that that establishes minimum contacts. But here, the lawyer in question, Mr. Tauscher, who resides in New Hampshire, is a half owner of Windward and one of three directors, oversaw the remediation of the Fox River on behalf of Appheon. He was involved in the day-to-day management of the litigation, involved in the day-to-day management of the remediation. So this is not a lawyer who was retained to defend an action. This is a lawyer who is the quintessential agent of his principle, in this case, Windward, and was involved in day-to-day activities. Certainly enough to constitute minimum contacts for the purposes of specific jurisdiction. Similarly, to suggest that Windward's stake in the outcome is not enough belies the fact that Windward is overseeing the litigation and that Appheon has no real interest in the litigation. So other than the involvement managing Appheon's claims, what other U.S. projects or business does Windward direct? None, and in fact, I think if Your Honor was to expand or limit that question to simply what other business does Windward have, the answer would be none. I mean, it is a single purpose entity that was specifically organized to manage these liabilities. So its principle business, in fact, one could argue its sole business, is to manage these liabilities and to pursue Appheon's historic insurance recoveries. So to that extent, the only business that Appheon has is this litigation and presumably stands to gain from any recoveries that Appheon may have, which is why the district court in an earlier ruling concluded that it may very well be a real party in interest, which we believe it is the real party in interest. Is there some amount of a fund that's in escrow someplace? No, Your Honor. Money that everybody's fighting over? Or maybe there isn't any, I don't know. Well, no, no, the money that everyone's fighting over are the historic costs of cleaning up the river. It's been estimated that the total cleanup costs will be a billion dollars. So there are contribution claims that both NCR and Appheon are pursuing against the Glatfelter Company. In this court's earlier ruling, the court concluded that Appheon's claim was a Section 107 claim. But again, that claim, although being pursued in the name of Appheon, is being managed and directed by Winward. In fact, Appheon's counsel is directed by Winward. So there was ample testimony, ample evidence in the record of Winward's involvement, and yet the court ruled on the papers. And I think both sides agree that if there are factual disputes, the court must hold an evidentiary hearing. And indeed, when a motion is decided on the papers, then the movement, in this case Glatfelter, has to simply make out a prima facie case. And all factual disputes must be resolved in Appheon's, in Glatfelter's favor as the movement. And one simple example is in the Brown County proceedings, Mr. Towsher testified that he was an employee of Winward. In the ancillary proceedings that are before this court, Mr. Towsher disputed that he was an employee of Winward and was simply retained by Winward. Rather than holding an evidentiary hearing to resolve that question, and that was certainly one of many questions that could have been resolved in an evidentiary hearing, the court took the affidavit that was filed in the ancillary proceedings and disregarded the sworn testimony in Brown County that he was an employee of Winward. That's just one simple example of why an evidentiary hearing ought to have been held in this case in the event that the court was inclined to deny the motion to compel. I mean, we believe the court should have simply granted the motion to compel and found that there were indeed not only minimum contacts, but significant contacts with the particular jurisdiction and with this particular action. If there are no other questions, then I will. All right. Thank you, Mr. Terrell. Thank you. Mr. King. Thank you, Your Honor. May it please the court, Jeremy King for Winward Prospects Limited. It is my pleasure and honor to be here, but my client should not be here before this court, and for two reasons. Mr. Cetera has spent his time talking about personal jurisdiction, and that's an important issue, but we have a threshold problem with this appeal. This is an unpermitted interlocutory appeal from a discovery motion for the district court. The ancillary action was decided by Judge Griesbach. The main action, the contribution action where API and Gladfelter, not Winward, are parties, is also before Judge Griesbach. The long history, in fact, the statutory jurisdiction given to this court is only over final decisions, except in certain limited circumstances. One limited circumstance, the only one that could even potentially apply here, is a collateral order doctrine. But for the collateral order doctrine to apply, the decision, the interlocutory decision being appealed, must be effectively unreviewable by the court of appeal in the case. And this happens in cases of transfer, because circuit court jurisdiction is geographical. You have jurisdiction over the district courts in this circuit and not elsewhere. Gladfelter did initiate this case in Massachusetts in the First Circuit, and if it had stayed there, then the discovery order would have been collateral, and there would be immediate appeal. But because the order was rendered here within this circuit, appeal is available at the end of the whiting action, the contribution case about the circle of costs. And therefore, it is interlocutory here and unpermitted. This court has found as much in the Sick-Gaik case, although it was deciding the converse of the issue. In that case, there was a interlocutory order in this circuit that dealt with a main action pending in another circuit. And therefore, review would not have been available by that circuit court where the main action was pending. And so Sick-Gaik proceeded. Here, this appeal needs to wait until the end of the main action so that Justice Griesbach can manage the case and bring the case to trial through discovery, which is the special province of the district court. Before I go on much further, I want to make one point about the submission. It is absolutely correct that we do not contend that this appeal is moot right now. In 30 days, it may well be if the consent order is entered. It is only because it hasn't been entered. I just want to be clear. There is no case that I have been able to find, no case in this country, where a district court has allowed a non-final interlocutory discovery order to be reviewed on appeal outside of the collateral order situation where they were ostensibly inter-circuit rather than intra-circuit. There are two relatively old cases that were pointed out in the briefing. One is from the 11th Circuit. Frankly, it's wrongly decided. The treatise authority on which the judges cite in the 11th Circuit has been amended and updated to reflect that the principle of collateral order doctrine only applies to inter-circuit review rather than intra-circuit appeal. And even with that decision applicable, it is about a decision from the Southern District of Florida and the Middle District of Florida. So even there, we don't have the same court deciding the discovery issue that was attempted to be appealed. The only other decision is a decision in the Federal Circuit. It's a patent case. They applied the rules the way that every circuit does, which is to say that if you are appealing from one district court in one circuit and the main action is in another circuit, we will hear the appeal. Frankly, it doesn't make a lot of sense given the scope of Section 1295 patent appeal jurisdiction. But it doesn't matter here. The important part is in that case the court, again, applied the principle that if the appeal comes out of two different circuits, it can be heard, but not if they're from courts within the same circuit. So fundamentally, this court cannot even decide its action yet. And Gladfelder hasn't cited anything, hasn't addressed it in argument, and hasn't given you a single case where the court has. And I submit that there are none. With respect to personal jurisdiction, it is not accurate to say that Windward's only business is this case. Companies certainly are not charged with carrying on other business to avoid jurisdiction in the United States courts. But Windward does. It is an investment company. It does have historic liabilities to former employees for retirement benefits, that sort of things. And it's managing its affairs. It does have an indirect indemnification obligation to Appian. The indemnity is to the parent of Appian, and the parent indemnifies Appian. At the same time, in 2001, when that indemnity was given, the responsibility for paying and managing it was assigned to a Bermuda entity. That Bermuda entity, referred to as AWAB for Bermuda, has since managed, made all of the payments, and done everything with respect to the indemnity. That entity is owned jointly by Windward and Appian. That entity has a number of directors appointed by Windward and Appian. And that is where the payments, were they relevant, that is where they come from. Windward is not making payments into the United States. Windward is not here managing the case in the United States. Much is made about Mr. Tauscher's role, and he is certainly an important person with respect to the remediation of the Fox River. But he does a number of things for a number of different companies. He is not, Windward embodied, wherever he walks. He is, for instance, a director of AWAB, and deals with that entity's obligations for the indemnification. He is also API and AWAB's member representative in an LLC. API and NCR have done the lion's share of the cleanup work on this river. To do that, they created an LLC to do the day-to-day operations of cleaning up the river, managing dredges, that sort of thing. Mr. Tauscher sits on that LLC as API, not Windward. API's representative of what will get done by that LLC. And so, yes, he was involved making those decisions, but he is doing so for Appian, the entity that the government has a claim against for at least 30 more days, the entity that is responsible for doing the cleanup. The mere financial interest that Windward may have to recoup some of the money it has spent is not enough to say that it has come into the United States and started conducting business here, such that it is availing itself of our laws and such that it is present here for minimum context. The breadth of that rule, that a company that has a financial interest in the outcome of a litigation is enough to grant personal jurisdiction, it's flabbergasting. It's breathtaking. Companies have lots of interests all over the world. It does not mean that they are present in the jurisdiction. You've heard, and I've heard sort of for the first time today, about the Brown County insurance litigation. You will find it difficult to look through the record to find any information on that because this was not argued below. Nothing about Mr. Gower was argued below. But it is of no moment anyway. Windward was sued. They did not prosecute these claims. Continental Casualty Company and CNA entities sued a number of people. They sued Affion, they sued Windward, they sued all of the other insurers. Windward never made an appearance in that case. Windward never submitted a pleading in that case. No party ever asserted a claim against Windward in that case. And Windward was non-suited at the end of that case because they had no involvement. That case was defended and brought in Affion's name. Affion had attorneys. Affion worked settlements there. But Windward was not present as Windward. Mr. Tauscher did testify. He testified as Affions, at that time API, but Affions, corporate designee, because he is the person with the most knowledge about what is going on here. He was involved in AWAB. He was involved then in the LLC, which, in fairness, out of chronological order, that happened later than the insurance case. But he knew about the facts of the matter better than anybody in-house at Affion. That does not mean he was there as Windward. He was there giving testimony on behalf of Affion. This doesn't create a contact for Windward in this jurisdiction. Is all that's left of this of insurance companies deciding which one owes, if any? In fact, that was resolved some time ago by settlement. Affion prevailed at trial in front of a jury at least five years ago. But the insurance companies ended up settling rather than going through the entire appeals process. And so that part of it is done. All that remains now is this dispute that's in front of Judge Griesbach about contribution, and with respect to API, it's cost recovery, not contribution, for the monies that were spent cleaning up the river. And the short version of the case is NCR and Affion together say they paid hundreds of millions of dollars and far more than their fair share. The merits of that likely will never come up to this court because, again, there has been a consent decree with the U.S. government that we expect will be approved, but has only been lodged at this stage. But the pending dispute is inter-PRPs, the parties who are alleged polluters, rather than with any of Affion's insurers any longer. There's also, again, for specific jurisdiction, and it is in the papers, there's a need for a nexus for some cause. You can't just say that people have come into the United States, Wisconsin, and that gives personal jurisdiction. For specific jurisdiction, there does need to be some kind of causal connection. And this court has said it's got to be something more than but-for cause. It's got to come closer to proximate cause. And here Gladfelter hasn't made any case that any of its claims arise out of these alleged contacts. Mr. Tauscher testifying in an insurance trial, for instance. There simply is no causal connection. Gladfelter's claims and defenses arise out of what has Affion received, what has Affion paid. We've also completely ignored the notion that Affion is a party to the main action. A party adverse to Gladfelter. Gladfelter's asked Affion for the same discovery request, and they've been produced there. And the district court in this ancillary action said, I don't understand why you're not asking Affion. You're asking questions about what monies did Affion receive? What monies did Affion pay? What did that go to pay for? You would think that you would ask Affion about these things. And, in fact, Gladfelter did. There's no reason to come after Winward for functionally the same documents. Affion has its own records about what it spent, what it received, what that money went to. And Gladfelter offers nothing other than speculation. It's had the opportunity to look at these documents to say, gee, there seems to be a gap. Where is this? We would expect to see this, and it's not here. And we don't see that argument. All we see is, well, we can't really be sure. How do we know for sure that the documents are duplicative? Well, that's not the standard. They need to show that they need this discovery. And there's no reason to believe Affion's documents are in some way incomplete. Finally, and before I run out of time, I'd like to talk briefly about my request for fees under Rule 37. This Court does not have jurisdiction over my cross-appeal for fees for the same reason that it does not have jurisdiction over Gladfelter's appeal. I am trying to appeal from a non-final interlocutory decision, and I can't do that. But if this Court is going to entertain that order, then that order has an error in it. Rule 37 is set up as a fee-shifting statute, but it's a different kind of fee-shifting statute. Gladfelter has cited two cases saying that attorneys' fees determinations are essentially severable, should be appealed separately. Those are cases where the District Court is given discretion. It says, in the Court's discretion, you may award fees on these cases. That is not what Rule 37 does. For better or worse, Rule 37 is mandatory. It's a hammer on litigants filing motions to compel. It does not say you should make a separate application. It triggers off the motion to compel itself. The rule has two subparts, and it says if the motion is granted, loser pays fees. Subpart B says if the motion is denied, loser pays fees. And it uses the word must, which is a wonderfully unique thing in federal rules. When a District Court must do something, you just don't see that very often. Especially paying fees. Right, especially paying fees. Again, I say for better or worse. This is not my favorite rule in the federal rules, but it is the rule. You must. There is an exception written into the statute for these rules. It says it allows if there is substantial justification. The Court made no finding of that here, and the error is that. Without that finding, there must be an award of fees. We ask for remand with instructions to enter the award of fees. Thank you very much, Your Honors. Thank you, Your Honors. I will address this Court's jurisdiction, but first I'd like to simply address. Mr. King suggested that the insurance proceedings were new to him. In fact, the record in this case, at 34-2 and 40-2, contain the testimony of Mr. Tauscher and the Brown County proceedings, as well as Mr. Gower's deposition. And in fact, in the deposition of Mr. Gower, the attorney, Ron Raggetts, who is the attorney for Appheon in the underlying action, entered his appearance at the deposition for Arjo Wiggins Appleton and Appleton Papers, Inc. So the suggestion that Arjo Wiggins Appleton didn't appear in those proceedings, I think is simply flat-out wrong, and the record will bear that out. Similarly, with regard to the argument of why didn't we get those documents from Appheon, first of all, we initially did seek to obtain the documents from Appheon, and Judge Griesbach suggested that there were other ways to obtain those documents, which is what set us off on the subpoena to Winward. But I think on the more fundamental question of are these the same documents, they simply are not, nor can they be. I mean, why would Appheon, for example, have communications between Mr. Tauscher and Mr. Gower, who are the two principals of Winward? So I think it's certainly in this world of electronic communications, it's frankly almost silly to suggest that Appheon would have the same set of documents as Winward. Now, with regard to this court's jurisdiction, prior to the 2013 amendments to Rule 45, the federal courts, including this court, recognized that a pretrial discovery order may constitute a final appealable order when issued by a district court in an ancillary proceeding, and said district court is not within the circuit of having appellate jurisdiction to review the final adjudication of the main action. So the parties both agreed that had we stayed in Massachusetts, we could have taken an appeal to the First Circuit. Now, what's different about this case is the change to Rule 45 in 2013, which allowed transfer under exceptional circumstances, and there are no cases which have yet reached this question. But the purpose of Rule 45-F is to allow transfer when, such as the case here, there are complex proceedings and the district court sitting in the issuing court, such as Judge Griesbach here, is more familiar with the action. So I see that my time is up. I don't want to cut you off on this jurisdiction issue. Sure. I think it's important. I think Judge Williams was trying to cut me off. No, to me, I don't see how you have jurisdiction. I'm not following that. And your ancillary and underlying action are both in the same district court in front of the same judge, so I don't think this is similar to the Eleventh Circuit or the Federal Circuit. And I think what you're trying to do is ignore geographic limitations on our jurisdiction. By seeing distinctions between, within, and beyond our circuit's geographic jurisdiction is illusory. No, what I'm seeing is that the change to Rule 45, in particular 45-F, allows for transfer in exceptional circumstances. We shouldn't be penalized. Had we stayed in Massachusetts, there's no question we would have had an appeal to the First Circuit. We shouldn't be penalized by seeking transfer to the court that presumably has greater familiarity with the case. That was the purpose of Rule 45. Rule 45 doesn't evince any intent to limit appeals. And in fact, in a situation such as this, we would be faced with the prospect, putting aside the consent decree with a four- to five-week trial, only to come back to this court and say, we still don't have the documents that we were entitled to from Wynwood. So I think that 45-F allowed for transfer. We moved for transfer because of exceptional circumstances. The district court in Massachusetts agreed with us, and I don't think we should be penalized for seeking that transfer. We could very well have stayed in Massachusetts, but I think that would have been a disservice to the district court in Massachusetts in a case where, as of yesterday, there were 1,906 docket entries in this case. And to ask the Massachusetts court to familiarize itself with that record and the complicated intertwining of these indemnifications, I think would have not been judicially efficient, and that's why we sought the 45-F transfer. Thank you, Mr. Soterio. Thank you, Mr. King. The case is taken under advisement.